**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Ogletree, Abbott, Clay & Reed
Law Firm, L.L.P.,

          Civ. No. 14-340 (RHK/TNL)
    Plaintiff,  **AMENDED MEMORANDUM**
v.          **OPINION AND ORDER**

FindLaw, West Publishing Corporation,
and Thomson Reuters Holdings Inc.,

       Defendants.

---

Thomas F. Handorff, Handorff Law Offices, P.C., St. Louis Park, Minnesota, for Plaintiff.

Tiffany A. Blofield, Craig S. Krummen, Winthrop & Weinstine, PA, Minneapolis, Minnesota, for Defendants.

---

## INTRODUCTION

  Plaintiff Ogletree, Abbott, Clay & Reed Law Firm, L.L.P. ("Ogletree") hired Defendants FindLaw, West Publishing Corporation, and Thomson Reuters Holdings, Inc. (collectively referred to as "FindLaw") to develop three of Ogletree's websites to increase traffic from search engines. Rather than enhance the quality of the websites, Ogletree alleges Findlaw diminished it and injured Ogletree's business as a result. After the parties failed to resolve their dispute amicably, Ogletree filed the instant action against FindLaw asserting six claims. FindLaw now moves to dismiss five of the six claims. For the reasons explained below, its Motion will be granted.

## BACKGROUND

FindLaw provides online advertising services to attorneys. One of its services is website development, aimed at helping attorneys increase their exposure to potential clients online. Ogletree is a law firm specializing in personal-injury matters. In 2012, it hired FindLaw to help develop three of its websites: www.ogletreeabbott.com, www.1800jonesact.com, and www.complawyers.net (collectively, the "Ogletree Websites").

Between November 2012 and June 2013, FindLaw and Ogletree entered into a series of contracts to redesign and improve the "search engine optimization" ("SEO")[1] of the Ogletree Websites. Ogletree paid FindLaw $61,965.69 for its services. FindLaw launched the revised Ogletree Websites in late April and early May 2013. Ogletree was not satisfied with the revised websites and alleges that their quality and SEO deteriorated rather than improved.

Ogletree alleges FindLaw did not utilize and migrate all of the existing indexed content and webpages from the original Ogletree Websites to the revised sites. For

---

[1] "Search engine optimization" is a common internet marketing strategy; its goal is to increase the visibility of a website in Google's and other search engines' search results by making changes to the website's content and formatting. See Wikipedia, "Search Engine Optimization," http://en.wikipedia.org/wiki/Search_engine_optimization (last visited June 4, 2014).
   For example, Google navigates the web by "crawling" from page to page via links. It sorts the pages by content and other factors and catalogues all of the information in its "index." When a user enters a search term, Google pulls documents relevant to that term from its index and ranks them based on over 200 factors. It then produces a list of search results for the user. See www.google.com/insidesearch/howsearchworks/thestory (last visited June 11, 2014). Search engine optimization reflects how much of a website is indexed by search engines like Google and how highly its content ranks among search results. The more indexed content and the better the ranking, the more likely a site is to show up on the first page of search results and thus, the more likely a user is to click on that result and visit the site.

example, the number of indexed webpages was reduced from 612 pages to 184 pages on www.ogletreeabbott.com, from 598 to 81 on www.1800jonesact.com, and from 1,358 to 157 on www.complawyers.net. (Compl. ¶ 14.) The more indexed pages with quality content on a website, the more opportunities there are for the website to be relevant to a user's search terms, potentially increasing the website's page ranking in Google and thus its visibility in the search results. (Id. ¶ 15.)

When redesigning the Ogletree Websites, Ogletree alleges that FindLaw ignored its webpage-naming conventions, creating error messages when users followed inbound links set to the prior page names. (Id. ¶ 16.) For example, it alleges www.complawyers.net contained 234 "page not found" errors. (Id.) If the information at the old webpage address was useful to users, FindLaw's changes and resulting errors would "cause the Ogletree website to lose the beneficial page rank that . . . inbound links [to those pages] would have otherwise provided." (Id.)

FindLaw also added software code to the Ogletree Websites that required users to download a large amount of data in order to view certain pages. Whereas the previous websites required users to download only .5 MB of data to view them, the revised websites required users to download more than 1.5 MB of data in some instances. (Id. ¶ 18.) The revised websites also required users to load twice as many files as the previous websites. (Id.) This affected the websites' load time, which is a factor for Google's ranking. (Id. ¶ 19.) In addition to adversely impacting Google rankings, these changes resulted in users abandoning the Ogletree Websites before they had loaded, causing Ogletree to lose out on potential clients. (Id.)

Ogletree alleges it told FindLaw not to place outbound links on its websites, but in October 2013, it discovered that FindLaw had "secretly inserted at least one outbound link on every page of the Ogletree websites which were directed to FindLaw's website." (Id. ¶ 20.)  As outbound links are generally beneficial to the site that receives them and may decrease the value of the website that posts it, these links diminished the value of Ogletree's Websites and improved the SEO of FindLaw's.  (Id.)  When Ogletree demanded FindLaw remove the outbound links, it did so, but offered no acknowledgement of or explanation for its conduct.  (Id.)

FindLaw "represented that it would build inbound links to the Ogletree Websites that would meet and conform to Google's SEO Guidelines."  (Id. ¶ 21.)  But Ogletree alleges FindLaw obtained *paid* links to the Ogletree Websites, which violate Google policy.  As a result, it alleges Google has "significantly penalized the Ogletree websites." (Id.)

Finally, Ogletree used Google Analytics to track its website performance, such as how many visitors used the websites, where the users had navigated from, and what they were doing on the websites.  Ogletree used this information to improve its websites and attract more users (potential clients).  When FindLaw launched the revised Ogletree Websites, the sites did not have Google Analytics code installed for the first 27 to 45 days (depending on which site).  (Id. ¶ 23.)

Ogletree alleges that FindLaw represented its "goods or services ha[d] characteristics or benefits" that they did not and that their "agreement confer[red] or involve[d] rights, remedies, or obligations" that it did not.  (Id. ¶ 17.)  It alleges Findlaw

- 4 -

"failed to disclose information concerning goods or services which was known at the time of the transaction thereby intending to induce Ogletree into entering into the referenced agreement, knowing that it would not have entered" but for these alleged misrepresentations. (Id.) It also alleges that FindLaw promised to improve the Ogletree Websites so it could get "more clients and more money" and "better results and more business," but instead Ogletree has fewer clients and less money. (Id.) Finally, Ogletree alleges FindLaw "misrepresented that it 'produces results' with 'custom content' developed by 'expert copy writers' and a 'dedicated team of attorney SEO experts' but FindLaw outsources to Bangalore, India and FindLaw cut its staff in January 2013 by 25%." (Id. ¶ 23.)

Dissatisfied with FindLaw's revisions to the Ogletree Websites, Ogletree stopped payment in September 2013. During a span of three weeks in November 2013, Ogletree removed the sites from FindLaw's servers and launched them on its own servers, then, in an attempt to resolve the matter, it relaunched the sites from FindLaw servers, and when the parties did not reach resolution, it again removed them from FindLaw's servers and launched them on its own. In February 2014, Ogletree filed the instant action, asserting claims for fraud, misrepresentation, deceptive trade practices, negligence, breach of warranties, and breach of contract. FindLaw now moves to dismiss all but the breach-of-contract claim.

**STANDARD OF DECISION**

The Supreme Court set forth the standard for evaluating a motion to dismiss in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S.

662 (2009). To avoid dismissal, a complaint must include "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 547. A "formulaic recitation of the elements of a cause of action" will not suffice. Id. at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).

When reviewing a motion to dismiss, the Court "must accept [the] plaintiff's specific factual allegations as true but [need] not . . . accept a plaintiff's legal conclusions." Brown v. Medtronic, Inc., 628 F.3d 451, 459 (8th Cir. 2010) (citing Twombly, 550 U.S. at 556). The complaint must be construed liberally, and any allegations or reasonable inferences arising therefrom must be interpreted in the light most favorable to the plaintiff. Twombly, 550 U.S. at 554–56. A complaint should not be dismissed simply because the Court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations. Id. at 556. Accordingly, a well-pleaded complaint will survive a motion to dismiss even if it appears that recovery is unlikely. Id. "Finally, the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009).

## ANALYSIS

**I.    Fraud and Related Claims**

Ogletree alleges FindLaw misrepresented its services to Ogletree, leading it to believe FindLaw would increase its websites' SEO and, in turn, increase its volume of

business.  Based on these alleged misrepresentations, Ogletree asserts claims for fraud, misrepresentation, and violations of the Minnesota and Texas Deceptive Trade Practices Acts (MDTPA and TDTPA, respectively).  Findlaw makes several meritorious arguments for why these claims should be dismissed, but the Court need address only one:  Ogletree failed to plead them with particularity.

"[I]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient." Schaller Tel. Co. v. Golden Sky Sys., Inc., 298 F.3d 736, 746 (8th Cir. 2002) (quotation omitted).  Instead, a plaintiff must plead the "who, what, where, when, and how" of the alleged fraud in order "to enable the defendant to respond specifically and quickly to the potentially damaging allegations."  Drobnak v. Anderson Corp., 561 F.3d 778, 783 (8th Cir. 2009).  This heightened pleading standard applies to fraud claims as well as claims involving misrepresentation.  Thus, Ogletree must plead with specificity its claims for fraud, misrepresentation, and deceptive trade practices.  See, e.g., Trooien v. Mansour, 608 F.3d 1020, 1028 (8th Cir. 2010) (applying Rule 9(b) to misrepresentation claim); DeVary v. Countrywide Home Loans, Inc., 701 F. Supp. 2d 1096, 1110 (D. Minn. 2010) (Schiltz, J.) (applying Rule 9(b) to MDTPA claim); Berry v. Indianapolis Life Ins. Co., 608 F. Supp. 2d 785, 800 (N.D. Tex. 2009) (applying Rule 9(b) to TDTPA claim).

Ogletree has failed to meet this standard with respect to all three claims. Ogletree's Complaint alleges very few specific misrepresentations.  Instead, Ogletree makes vague and conclusory allegations, such as "FindLaw has represented its goods or

services have characteristics or benefits, which they do not have, represented that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law[,] and failed to disclose information concerning goods or services which was known at the time of the transaction." (Compl. ¶ 17.) These allegations do not pass muster under Rule 9(b).

Even Ogletree's most specific allegations fall far short of the requisite particularity. Ogletree alleges FindLaw promised it "more clients and more money" and "better results and more business" and told it that FindLaw "'produces results' with 'custom content' developed by 'expert copy writers' and a 'dedicated team of attorney SEO experts.'"[2] This is a step in the right direction, as Ogletree has at least put FindLaw on notice of the *content* of the alleged misrepresentations. Nevertheless, Ogletree provides no information about their *circumstances*. While a plaintiff may not need to plead all of the circumstances surrounding the fraud, it must plead at least a few. Here, Ogletree has not alleged who communicated these alleged misrepresentations, to whom, when, where, or how. Accordingly, Ogletree's three fraud-related claims will be dismissed for failure to plead with particularity.

---

[2] In response to the instant Motion, Ogletree has attempted to amplify its allegations by submitting an affidavit of Ogletree's managing partner regarding FindLaw's verbal and written representations and voluminous exhibits thereto. The contents of this affidavit and its exhibits constitute "matters outside the pleadings" and thus the Court cannot consider them without converting the Motion into one for summary judgment, Ashanti v. City of Golden Valley, 666 F.3d 1148, 1151 (8th Cir. 2012) (only the pleadings and "documents necessarily embraced by the pleadings" may be considered on a motion to dismiss under Rule 12(b)(6)), which it declines to do.

## II. Breach of Warranties

Ogletree asserts that FindLaw breached its warranties by selling services that were not "of merchantable quality" and not fit for their intended use. Although the claim is styled as "breach of expressed and implied warranty," Ogletree has not identified any *express* warranty pleaded in the Complaint.[3] It pleaded only implied warranties. But its claim fails on this front too, because implied warranties arise in contracts for the sale of goods, not services, Master Blaster, Inc. v. Dammann, 781 N.W.2d 19, 35 (Minn. Ct. App. 2010); Cargill, Inc. v. Ron Burge Trucking, Inc., Civ. No. 11-2394, 2013 WL 608520, at *3 (D. Minn. Feb. 19, 2013) (Magnuson, J.), and Ogletree's contracts with Findlaw were for services.

## III. Negligence

Finally, Ogletree alleges FindLaw "was negligent in the promotion and sale of its website redesign, SEO marketing services and internet attorney marketing services." FindLaw challenges whether it owed Ogletree any "duty" that could provide the basis for this claim. Whether a defendant owed a duty to a plaintiff is a question of law. Woehrle v. City of Mankato, 647 N.W.2d 549, 551 (Minn. Ct. App. 2002) (citing Lundman v. McKown, 530 N.W.2d 807, 820 (Minn. Ct. App. 1995)).

Ogletree alleges FindLaw breached its "duty of reasonable care by its words and actions against [Ogletree]." (Compl. ¶ 51.) Ogletree provides no further elaboration of

---

[3] Rather, Ogletree alleges in its Memorandum that FindLaw made express warranties *not* mentioned in the Complaint, but attested to by Ogletree's managing partner in his inadmissible affidavit, see supra note 3. (Pl.'s Mem. at 26 (listing four express warranties, none of which was alleged in the Complaint).)

- 9 -

or authority for this alleged duty.  Under Minnesota law, a negligence claim cannot be based on a breach of duty that is indistinguishable from the breach of contract.  See Lesmeister v. Dilly, 330 N.W.2d 95, 102 (Minn. 1983) (Minnesota does not recognize negligent breach of contract); Nelson v. Saxon Mortg., Inc., Civ. No. 12-1312, 2014 WL 186163, at *23 (D. Minn. Jan. 16, 2014) (Tunheim, J.).  A plaintiff may only maintain a negligence claim in the context of a contract action if "a relationship would exist which would give rise to the legal duty without enforcement of the contract promise itself." Hanks v. Hubbard Broad., Inc., 493 N.W.2d 302, 308 (Minn. Ct. App. 1992).  As Ogletree has not alleged such a relationship, it appears that any duty FindLaw owed it was "only as a result of the parties' contractual relationship," and thus Ogletree's allegations are "properly analyzed as part of [its] breach-of-contract claim, not as a negligence claim."  Nat'l Broom Co. of Ca. v. Target Corp., Civ. No. 12-1201, 2012 WL 4856295, at *4 (D. Minn. Oct. 12, 2012) (Kyle, J.).

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that FindLaw's Motion to Dismiss (Doc. No. 8) is **GRANTED**.  Counts I, II, IV, V, and VI of the Complaint (Doc. No. 1) are **DISMISSED WITHOUT PREJUDICE**.

Dated: June 11, 2014                                                   s/Richard H. Kyle
                                                                                         RICHARD H. KYLE
                                                                                         United States District Judge